## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## CLEVELAND DIVISION

| | |
|---|---|
| DAYTONA TECH  REPAIR LLC AND DELAND TECH REPAIR LLC, INDIVIDUALLY, AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,  Plaintiffs, | § § § § § § § |
| v. | § § |
| MMI-CPR, LLC 7100 EAST PLEASANT VALLEY RD. SUITE 300 INDEPENDENCE, OH 44131 | § § § § § § |
| ASSURANT, INC., 28 LIBERTY ST., 41ST FLOOR NEW YORK, NY 10005 Defendants | § § § § |

CIVIL ACTION FILE NO.

_____

Jury Trial Demanded

### CLASS ACTION COMPLAINT

Plaintiffs Daytona Tech Repair LLC and DeLand Tech Repair LLC ("Plaintiffs") file this Class Action Complaint against MMI-CPR, LLC, dba Cell Phone Repair ("CPR") and Assurant, Inc. ("Assurant").

### NATURE & BASIS OF ACTION

Plaintiffs represent hundreds of small franchisees who sell cost-effective cell phone repair services to their respective communities. Many of the people who operate these businesses are first-time franchise owners. Most operate only one or two stores. Many invested years of their savings in a chance to operate this much needed franchise business. Others owned successful independent phone

repair businesses before being convinced to acquire a CPR franchise. After all, the CPR franchise had proved to be a good deal for these hard-working business owners.

Assurant, a Fortune 500 insurer, acquired CPR in 2019. It soon changed the deal.

First, Assurant caused CPR to impose onerous new burdens on its franchisees, wholly to benefit itself at their expense. CPR representatives have admitted that Defendants forced franchisees to absorb substantial costs that help to protect Assurant's business relationship with cell phone manufacturers—but that offer no benefit to the franchisees. For example: CPR forced franchisees to purchase all repair parts from Mobile Defenders, a supplier Assurant partially owns, even though CPR representatives have acknowledged Mobile Defenders' products cost more and are of poorer quality than competing suppliers. CPR prevents franchisees from buying other suppliers' components in order to drive revenue to Assurant-owned Mobile Defenders, and because Assurant uses Mobile Defenders to curry favor with leading phone manufacturer Apple.

Another example: Assurant and CPR changed the deal so that franchisees now may install only Apple-manufactured (*i.e.*, Original Equipment Manufacturer or "OEM") cell phone batteries. OEM batteries are much more expensive and far less profitable than non-OEM batteries. Before Assurant's interference, non-OEM battery replacements were a major source of revenue for franchisees. CPR's OEM mandate depressed revenues and profits at CPR franchise stores—but advanced Assurant's business relationship with Apple. Neither CPR nor Assurant expected the OEM requirement to benefit the franchisees, and indeed the financial cost has been crippling.

While Assurant and CPR piled higher and higher costs on the franchisees, Assurant started *directly competing with CPR franchisees*. CPR originally promised franchisees that Assurant had used its industry clout to arrange with a major client, T-Mobile, to send its customers to franchisees for insurance repairs. That promise would have generated significant profits for the franchises. To support the new relationship with T-Mobile, CPR required franchisees to invest in store renovations and other

costs that would meet T-Mobile's expectations. Franchisees opened stores, renovated stores, and hired employees based on CPR's and Assurant's representations.

But then Assurant changed the deal once again. It agreed with T-Mobile that Assurant would provide repairs within T-Mobile stores—cutting out the franchisees entirely and leaving them in an even worse position. When angry franchisees confronted CPR about its broken promises of T-Mobile business, CPR representatives admitted there had never been an agreement with T-Mobile. Then, over the past year, Assurant has opened hundreds of repair kiosks inside T-Mobile stores in direct competition with CPR franchisees. Even CPR executives described this as "a gut punch" to franchisees.

As if that were not enough, Assurant now actively recruits employees away from its own franchisees to staff the T-Mobile locations, offering higher wages and bonuses. Although this practice continues today, CPR still does not disclose to prospective new CPR franchisees that its ultimate parent is actively competing against them. CPR and Assurant's selfish conduct robbed franchisees of revenues and forced stores to fail.

Plaintiffs file this action to recover damages from Defendants arising from breaches of their cell phone repair franchise agreements, fraud and negligent misrepresentation, unlawful interferences with their franchise agreements, and other claims. Plaintiffs seek damages and recovery of their reasonable costs and attorneys' fees.

## PARTIES & SERVICE

1.      Plaintiff Daytona Tech Repair LLC is a Florida limited liability company with its principal place of business in Daytona, Florida. Daytona Tech Repair is a current CPR franchisee.

2.      Plaintiff DeLand Tech Repair LLC is a Florida limited liability company with its principal place of business in DeLand, Florida. DeLand Tech Repair is a current CPR franchisee.

3.      Defendant MMI-CPR, LLC ("CPR") is a Delaware limited liability company with its principal place of business at 7100 East Pleasant Valley Road, Suite 300, Independence, Ohio 44131. CPR may be served by serving its registered agent, Jessica E. Czekalinski, at 7100 East Pleasant Valley Road, Suite 300, Independence, OH 44131.

4.      Defendant Assurant, Inc. ("Assurant") is a Delaware corporation with its principal place of business at 28 Liberty Street, 41st Floor, New York, NY 10005. Assurant may be served by serving its registered agent, Katherine Greenzang, Esq., at 28 Liberty Street, 41st Floor, New York, NY 10005.

5.      Diversity of the parties exists in this matter, pursuant to the Class Action Fairness Act of 2005. At least one plaintiff in this matter is a resident from a state that is different from at least one defendant.

    a.  All Plaintiffs are citizens of Florida pursuant to 28 U.S.C. § 1332(c).

    b.  Citizenship of the entities named as defendants in this suit is as follows:

        i.   Assurant, the corporate defendant, is incorporated in Delaware. Based on documents reviewed by Plaintiffs, and upon information and belief, the principal place of business for Assurant is in New York.[1] Accordingly, Assurant is a citizen of Delaware and New York for diversity purposes.

        ii.  MMI-CPR is a Delaware limited liability company. Plaintiffs reviewed documents regarding these defendants and their ownership.[2] Based on that review, and upon

---

[1] Plaintiffs reviewed company filings with the Ohio Secretary of State and the Securities & Exchange Commission for the corporate defendant.

[2] Plaintiffs reviewed pleadings by MMI-CPR in the Northern District of Texas alleging that MMI-CPR is a Delaware limited liability company. Its members are MMI-CPR Holdings, LLC, a Delaware limited liability company, and Service Optimization Solutions, Inc., a Florida corporation with its principal place of business in New York. MMI-CPR Holdings; members are Merrymeeting, Inc., a Delaware corporation with its principal place of business in Ohio, and HUNIL, LLC, a Delaware limited liability company. HUNIL's sole member is Jeff Gasner, a citizen and resident of Illinois. Accordingly, MMI-CPR is a citizen of Delaware, Florida, New York, Ohio, and Illinois.

information and belief, MMI-CPR is a citizen of Delaware, Florida, New York, Ohio, and Illinois for diversity purposes.

6.      Plaintiffs located no information suggesting that the principal place of business or place of incorporation of the corporate defendant is in the states of citizenship for the plaintiffs.

### JURISDICTION & VENUE

7.      This court has subject matter jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are at least 100 members of the class, and at least one of the defendants is a citizen of a state different from that of at least one Class member.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district. Also, venue is proper under 28 U.S.C. § 1391(b)(2), as CPR has its principal place of business in Ohio at 7100 East Pleasant Valley Road, Suite 300, Independence, OH 44131 and is a citizen of Ohio for diversity purposes.

### PLAINTIFF'S CLASS ALLEGATIONS

9.      Plaintiffs bring this action as a Class Action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who, during the period of 2010-2022 entered into franchise agreements with MMI-CPR (or its predecessors). Excluded from the Class are the defendants herein, the affiliates, owners, officers, and directors of the defendant, and the legal representatives, heirs, successors or assigns of any such excluded party.

10.      The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiffs at this time, plaintiffs are informed and believe that MMI-CPR entered into more than 500 franchise agreements with franchisees during the applicable period.

11.     Plaintiffs' claims are typical of the claims of the Class because plaintiffs and all the Class members sustained damages which arose out of defendants' wrongful conduct complained of herein.

12.     Plaintiffs are representative parties who will fully and adequately protect the interests of the Class members. Plaintiffs have retained counsel who are experienced and competent in both class action and commercial litigation, including breach of contract and franchise law. Plaintiffs have no interests which are contrary to or in conflict with those of the Class they seek to represent.

13.     A class action would be superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

14.     The prosecution of separate actions by individual class members would create a risk of inconsistent and varying adjudications concerning the subject of this action, which adjudication could establish incompatible standards of conduct for defendants under the laws alleged herein. Further, questions of law and fact common to the members of the Class predominate over any questions which may affect only individual members in that defendants has acted on grounds generally application to the entire Class. Among the questions of law and fact common to the Class are:

   a.  Did CPR breach its franchise agreements with the class members by requiring franchisees to sell Apple OEM batteries?

   b.  Did CPR breach an implied covenant of good faith and fair dealing by requiring franchisees to sell OEM Apple batteries?

   c.  Did CPR breach the franchise agreements with the class members by requiring franchisees to use Mobile Defenders as their exclusive supplier?

   d.  Did CPR breach an implied covenant of good faith and fair dealing by requiring franchisees to use Mobile Defenders as their exclusive supplier?

e.  Did CPR breach the franchise agreements due to its failure to disclose information to the franchisees about its marketing expenses?

f.  Did CPR fail to include necessary and legally required disclosures within its Franchise Disclosure Document, including (a) Assurant's ongoing establishment of repair kiosks in CPR franchisees' territories and increased competition for customers and employees; (b) CPR's requirement that franchisees sell only Apple OEM batteries (c) Mobile Defender's price and quality deficiencies compared to other suppliers; and (d) that a significant portion of current franchisee revenue comes from the sale of gaming systems rather than cell phone repairs?

g.  Has Assurant tortiously interfered with the franchisees current contractual and business relations with CPR and other third parties?

h.  Has Assurant tortiously interfered with the franchisees' prospective business relationships, including potential customers and vendors?

## FACTUAL ALLEGATIONS

### CPR's origin and business model

15.     CPR started in 1997 and began franchising in the early 2010s, expanding rapidly. By December 2021, there were 469 CPR franchised stores open around the United States.

16.     CPR sells franchisees "a franchise to operate cell phone repair businesses within specified geographic areas using the 'CPR' marks that provide repair services we authorize for smart phones, cell phones, laptops, game systems and other electronic devices." CPR offers franchisees the exclusive right to operate CPR stores within their designated geographic area.

17.     Franchisees' minimum investment to acquire a CPR franchisee is approximately $50,000. Many invest far more, in some cases totaling hundreds of thousands of dollars.

18.     CPR provides a Franchise Disclosure Document to each prospective franchisee. The Franchise Disclosure Documents purportedly contain the disclosures required under federal law (*see, e.g.* 16 C.F.R. § 436.1 *et seq.*) and applicable state law.

19.     When a prospective franchisee agrees to purchase a franchise, the franchisee and CPR enter into a Franchise Agreement. Assurant is not a party to those agreements.

20.     Many of CPR's franchisees are small businesspeople who have invested years of savings into the franchise. Others owned successful independent phone repair businesses before being lured into converting into a franchise with promises of business from CPR's "national accounts" that have never materialized.

**Assurant acquired CPR in 2019**

21.     Assurant acquired CPR in late 2019. Assurant is one of two market-dominant national cell phone insurers and has contractual relationships with major cell phone manufacturers.

22.     Assurant rebranded CPR as "CPR by Assurant."

23.     Assurant has required CPR stores to take certain actions, described below, to advance its business relationships with cell phone manufacturers—even knowing those requirements would cripple the franchisees.

**CPR mandated that franchisees buy parts exclusively through Mobile Defenders, despite its higher prices and lower quality.**

24.     At Assurant's insistence, CPR demanded that franchisees purchase all cell phone repair supplies through Mobile Defenders. Assurant partially owns Mobile Defenders. Franchisee purchases generate a significant portion of Mobile Defenders' revenue.

25.     Franchisees were not always so constrained. The 2017/2018 Franchise Agreement describes Mobile Defenders as the "<u>non-exclusive</u> primary required supplier of repair parts." So does the 2019/2020 Franchise Disclosure Document. As of mid-2020, franchisees purchased just half (approximately) of their repair parts from Mobile Defenders.

26.     The Franchise Disclosure Documents also characterized Mobile Defenders as offering "competitive" costs. The 2017/2018 and 2019/2020 Franchise Disclosure Documents stated that Mobile Defenders "currently utilizes a cost-plus formula to better ensure that the prices offered on such repair parts are competitive." In other words, Mobile Defenders supposedly marked-up its prices a limited amount to ensure its parts' prices were competitive with other suppliers' prices.

27.     The Franchise Agreements further provided that CPR would not "unreasonably deny" requests "to approve a proposed supplier" so long as CPR had not designated an exclusive supplier already.[3]

28.     Franchisees repeatedly asked CPR to authorize additional suppliers before and after CPR designated Mobile Defenders as the exclusive supplier.

29.     The Franchise Agreements also constrained CPR to use "reasonable discretion" in imposing requirements on franchisees, "including purchasing new Equipment and signage . . . changing any Products and/or Services offered, methods of operation and otherwise as we may require to reflect our then-current System requirements."[4]

30.     In 2020, Assurant acquired a minority ownership interest in Mobile Defenders.

31.     In late June 2020, CPR declared that Mobile Defendants would become the exclusive parts supplier for franchisees. CPR told franchisees that Mobile Defenders had to meet certain requirements to remain the exclusive supplier, including offering competitive pricing and maintaining sufficient parts in stock. CPR promised it would monitor Mobile Defenders' compliance with those standards. CPR's website even now touts franchisee access to "preferred supplier pricing."[5]

---

[3] *See, e.g.,* 2016/2017 Franchise Agreement § 7.2; 2017/2018 Franchise Agreement § 7.2; 2019/2020 Franchise Agreement § 7.2.

[4] *See e.g.,* 2016/2017 Franchise Agreement § 7.1; 2017/2018 Franchise Agreement § 7.1; 2019/2020 Franchise Agreement § 7.1; 2020/201 Franchise Agreement § 7.1.

[5] https://www.cellphonerepair.com/franchise/

32.     CPR admitted to franchisees that it had moved to a "closed" supply chain, *i.e.*, with one exclusive supplier, because of Assurant's business relationships. CPR claimed this was because it wanted to avoid claims by Apple against Assurant or disruptions in the Apple-Assurant relationship from CPR franchisees' potential use of purportedly "counterfeit" Apple parts from other suppliers.

33.     But CPR representatives left out of their explanation Assurant's new partial ownership of Mobile Defenders and its consequent desire to increase Mobile Defenders' revenue. They also failed to explain that other cell phone part suppliers could provide non-counterfeit parts at more competitive prices and without Mobile Defenders' quality issues.

34.     Despite CPR's promises in the Franchise Disclosure Documents and to franchisees directly, Mobile Defenders has not offered competitive pricing or part availability. To the contrary, CPR imposed and has maintained the Mobile Defenders-exclusivity requirement despite knowing that Mobile Defenders overcharges, provides lower quality parts, and is regularly out of key parts.

35.     As to price, CPR's own internal comparisons and franchisee-prepared comparisons show Mobile Defenders' parts on average were more expensive than other providers. To provide just one example, Mobile Defenders sells CPR-mandated Apple-manufactured products (as discussed below) for *higher prices than Apple offers directly to consumers*. Mobile Defenders, with bulk purchasing power, should be able to obtain manufacturer parts for less than standard retail pricing. CPR representatives have admitted to franchisees that Mobile Defenders' prices are higher than those offered by other suppliers.

36.     As to quality, CPR's internal tests showed Mobile Defenders scored below competing suppliers in several quality indicia. Franchisees also consistently return a large number of Mobile Defenders products.

37.     And, as to availability, CPR representatives acknowledged Mobile Defenders' failure to stock needed parts. In just the last month, Mobile Defenders did not have key parts in stock for the iPhone 11, a widely used phone generating large amounts of repair business.

38.     Mobile Defenders' problems have a ripple effect on franchisees' business. Mobile Defenders' parts break and unhappy customers return and complain online. This drives down franchisees' revenues and harms the stores' reputation, which in turn reduce sales.

39.     In short, despite knowing of Mobile Defenders' problems and Mobile Defenders' inabilities to meet CPR's own self-imposed standards for an exclusive supplier, CPR forced franchisees to purchase exclusively from this supplier, costing franchisees tens of thousands of dollars, per store, annually. There was no reason for this new requirement—imposed more than a decade into CPR's existence as a franchise—except Assurant's desires to promote its business relationship with Apple and to maximize sales through its partially owned subsidiary Mobile Defenders.

40.     CPR's imposition of Mobile Defenders as the exclusive supplier of franchisee repair parts was not an exercise of its "reasonable discretion" and violated the Franchise Agreements.

41.     CPR did not stop with the Mobile Defenders mandate. Over the past year, it has imposed other harmful requirements on franchisees solely to promote Assurant's business interests.

**CPR required franchisees to become Apple Independent Repair Partners ("IRP") at significant cost and for no benefit.**

42.     In 2021, CPR began effectively requiring franchisees to become Apple Independent Repair Partners ("IRP"). Franchisees that did not become Apple IRP were penalized through increased royalties, loss of fixture financing, loss of participation in national account programs, and higher costs on the mandatory Apple OEM batteries (as described below). Ultimately, at least 300 stores complied with the Apple IRP requirements.

43. Becoming IRP certified required at least 20 hours of paid employee time to complete Apple training courses and expensive equipment purchases. CPR representatives admitted the lost employee time, alone, was a significant cost to franchisees.

44. CPR promised the IRP certification would lead to increased business. That increase was supposed to include new sales through Assurant insureds bringing in phones for repair.

45. Obtaining the IRP certification, however, did not benefit franchisees. It did not lead to the promised increased business. Worse, CPR even *restricted* franchisees from marketing their IRP certification in efforts to generate the promised new sales.

46. What the IRP training did do, though, was make CPR employees more attractive candidates for Assurant to hire away (as discussed below).

47. Upon information and belief, CPR imposed the IRP requirement to promote Assurant's business relationship with Apple and to make franchisee employees more attractive candidates to be hired at Assurant's competing repair business.

**CPR required franchisees to sell only Apple-manufactured batteries, costing franchisees thousands of dollars a month.**

48. For almost all of CPR's existence as a franchise, franchisees sold Apple iPhone batteries that were made by a variety of manufacturers (these are known as "aftermarket" parts). Those batteries were an important source of profit for franchisees.

49. That changed in mid-2021. CPR required franchisees to sell only Apple-manufactured batteries. Those parts, known as Original Equipment Manufacturer ("OEM") parts are more expensive than aftermarket parts—as CPR representatives have admitted. Forbidding sales of aftermarket batteries has eliminated an important profit source for many franchisees, who have estimated reduced battery sales from 25-50% since the OEM mandate was imposed.

50. The OEM requirement also makes repairs more difficult. Installing OEM parts required customers to disable the "Find my iPhone" application, and many customers lack the

information necessary to disable the application. This deters them from purchasing replacement batteries.

51.     The Apple OEM-mandate serves no legitimate business purpose for CPR franchisees. It has not generated additional insurance claims repair business. Customer demand for these more expensive batteries is highly limited, as CPR representatives have admitted. CPR enforced the mandate solely to advance Assurant's business relationship with Apple at franchisees' expense.

### In mid-02021, CPR promised franchisees increased business from T-Mobile insurance claims

52.     During June and July 2021, including on June 4, June 11, and June 18, CPR and Assurant representatives, including Managing Director-Franchise Operations Chris Jourdan and Assurant Vice President of Retail Blair Frock, promised CPR franchisees that they would receive repair business from T-Mobile, one of Assurant's large insurance clients. The representatives told franchisees that Assurant customers using T-Mobile phones would be directed to CPR stores for repairs covered by Assurant insurance. CPR representatives made these promises in weekly calls open to all franchisees (called network update calls), in conversations with franchisees, and in increased revenue projections emailed to franchisees. CPR encouraged franchisees to purchase additional equipment to deal with increased claim volume.

53.     Many franchisees acted in reliance on CPR's promises. They purchased extra parts, hired new employees, and opened or acquired CPR franchises in expectation of the promised T-Mobile business.

### Despite CPR's promises, Assurant took the promised T-Mobile business and began recruiting franchisees' employees away.

54.     What actually happened is not what CPR promised. In the fall of 2021, CPR told stunned franchisees that Assurant and T-Mobile had reached an agreement. *Assurant* would make

repairs for T-Mobile insurance claims—not CPR franchisees. Assurant would establish more than 500 repair facilities in T-Mobile stores around the country to provide the repairs.

55.     A September 16, 2021 T-Mobile press release explained[6]:

> BELLEVUE, Wash. — September 16, 2021 — T-Mobile (NASDAQ: TMUS) today announced it will soon offer in-store same day device repairs at 500 stores across the country – with more on the way – and is adding new Protection<360>® benefits for customers, all starting November 1, 2021.
>
> - **New in-store authorized repair locations.** T-Mobile is upgrading 500 stores across the country to now include in-store device repairs by industry-certified experts from Assurant, with more locations to come. This is the first time T-Mobile will offer in-store repairs, and service locations are coming to nearly every major city across the country. Starting November 1, customers with Protection<360> can check the T-Mobile Store Locator to find an authorized location and then use the online appointment tool (coming soon!) to get same-day repairs right inside a T-Mobile store. Repairs will be completed with some of the most highly-credentialed mobile repair technicians in the industry — that use only manufacturer-approved parts and are committed to fast and reliable service.

56.     While Assurant was getting its repair facilities established, CPR stores got a limited amount of business from T-Mobile Assurant insureds. That business stopped completely in November 2021 when Assurant began handling repairs for all T-Mobile insureds.

57.     CPR representatives credited the franchisee network for helping Assurant win the T-Mobile business. On information and belief, Assurant used the 400-plus CPR franchisees as an inducement for T-Mobile to negotiate a repair contact, but then ultimately reached an arrangement that benefited Assurant while siphoning customers away from the franchisees.

58.      Franchisees complained. In response, CPR representatives characterized the change in plans and new competitor as "a gut punch" to franchisees.

59.     CPR representatives also admitted they lacked knowledge of the Assurant/T-Mobile negotiations and believed it was unlikely Assurant would have ever selected CPR franchisees as its primary repair source. CPR should have disclosed its lack of knowledge and reservations about the

---

[6]     https://www.t-mobile.com/news/devices/t-mobile-adds-in-store-repairs-and-more-device-protection-benefits-for-customers

Assurant/T-Mobile negotiations before franchisees expanded in reliance on the promised T-Mobile business.

60.     Despite their professed ignorance, CPR representatives appear to have known about the Assurant/T-Mobile deal as early as June 2021—when they were promising franchisees T-Mobile business. Assurant was hiring cell phone repair technicians in June 2021. CPR told franchisees then that Assurant was hiring because it had a contract with "a client" that required staffing their locations. That is eerily similar to the arrangement between T-Mobile and Assurant that CPR disclosed months later in September.

**Assurant hired CPR employees to set up competing cell phone repair kiosks in T-Mobile stores.**

61.     To staff the new T-Mobile stores, Assurant began recruiting CPR employees.

62.     CPR was aware at the time that franchisees were facing difficulty in staffing technicians. CPR representatives acknowledged the economic impact to franchisees of losing key employees and promised it would not "poach" CPR franchisee employees.

63.     Despite those promises, Assurant targeted CPR franchisees' technicians. The technicians made attractive candidates because many had just completed the Apple IRP training. Assurant targeted help-wanted ads to CPR employees directly by emailing them, using hashtags like #cpr #cellphonerepair in job postings, offering higher salaries than CPR stores, and offering signing bonuses. In at least one instance, an Assurant representative *recruited CPR employees from within the CPR franchise store*. Assurant has hired at least 100 employees from CPR stores. This competition for technicians increases franchisee personnel costs.

64.     Assurant continues to aggressively hire cell phone repair technicians. The top of Assurant's hiring website invites prospective employees to "[j]oin one of the largest smartphone repair

teams in the U.S. at one of our T-Mobile store locations" and declares: "We're hiring cell phone repair techs and leads in T-Mobile stores across the U.S.!"[7]

**Assurant competes with franchisees within their exclusive territories**

65. The T-Mobile / Assurant deal has cost CPR franchisees customers. Many of Assurant's hundreds of repair kiosks are within CPR franchisees' exclusive territories and take business from CPR stores. When Assurant insureds go to CPR stores for repairs, Assurant has told franchisees to direct the insureds to the Assurant T-Mobile kiosks for repairs.

66. The Assurant kiosks within T-Mobile stores are not limiting repairs just to Assurant insureds using T-Mobile phones. They are also repairing phones for customers who are no longer insured, lowering repair costs as discounts for agreeing to insurance plans, and selling insurance to customers that incentivizes them not to use CPR stores in the future.

67. In short, CPR's parent company is opening hundreds of repair facilities that directly compete with CPR franchisees and will continue to do so for the foreseeable future.

**CPR has not disclosed the true state of the franchise network**

68. In recent years, CPR franchisees have suffered economically. The Mobile Defenders' mandate imposed higher costs and parts shortage, the OEM-only mandate eliminated a major source of franchisee revenue, and Assurant increased competition for customers and employees. As a result, an unprecedented number of CPR franchisees report they have closed or will close this year and franchisee numbers decreased in 2020 and 2021 after years of expansion.

69. Franchisees have been forced to diversify away from cell phone repair. Many of the remaining profitable franchisees generate substantial portions of their revenue from sales of gaming consoles (primarily the Playstation 5 console) on credit—not from actual phone repairs.

---

[7] *See* https://jobs.assurant.com/en/cell-phone-repair-tech-jobs/?utm_source=careers&utm_medium=banner

**CPR failed to provide the promised operational support for its franchisees**

70.     As financial pressure on franchisees has mounted, CPR has become increasingly distant and non-responsive.

71.     The Franchise Disclosure Documents promise that CPR will "offer [franchisees] a reasonable amount of continuing advisory services by telephone during normal business hours."[8]

72.     The Franchise Agreements promise that CPR:

will promptly provide such advice and information as we consider reasonably appropriate to assist you with all methods and procedures associated with the System marketing and advertising; management and administration, the use of the Image or any changes to it and the use and application of Products and Services. You understand and agree that such advice and information may be rendered by phone, electronically, through the Manuals, training and/or by such other means as we deem appropriate in our sole discretion.[9]

73.     Yet when franchisees have reached out to CPR for assistance, they have met with silence. Franchisees report that phone calls and emails to CPR for assistance go unanswered for weeks and are sometimes never responded to. CPR's lengthy delays and silence does not constitute "reasonable amount[s] of advisory services" or "reasonably appropriate" advice.

**CPR has not disclosed Assurant's competition with CPR franchisees or other material information**

74.     Federal regulations require franchisors to disclose material information to prospective purchasers in the franchise disclosure document.[10] Specifically, federal regulations provide that if "the franchisor or an affiliate operates . . . a business under a different trademark and that business sells or will sell goods or services similar to those the franchisee will offer" the franchise disclosure document must describe the competing business, if it will compete within the franchisee's territory, and "the

---

[8] *See, e.g.,* 2017/2018 Franchise Disclosure Document at 27; 2019/2020 Franchise Disclosure Document at 22; 2021/2022 Franchise Disclosure Document at 20.

[9] *See, e.g.,* 2016/2017 Franchise Agreement § 10.4; 2017/2018 Franchise Agreement § 10.4; 2019/2020 Franchise Agreement § 10.4; 2020/2021 Franchise Agreement § 10.4.

[10] *See* 16 C.F.R. § 436.1 *et seq.*

---

timetable for the plan."[11] Additionally, those regulations require disclosure of "franchisor-imposed restrictions or conditions on the goods or services that the franchisee may sell or limit access to customers . . . ."[12]

75.     Additionally, under common law principles, CPR has an obligation to disclose material information to correct misleading impressions that are or might have been created by a partial revelation of the facts.

76.     CPR has not disclosed the following in Franchise Disclosure Documents or otherwise informed potential franchisees that:

i.      Assurant, CPR's ultimate owner with access to CPR franchisee sales and employee information, is actively competing with CPR franchisees across the country.

ii.     Franchisees must sell only Apple OEM batteries.

iii.    Mobile Defender's price, quality, and availability problems or that Mobile Defenders charges more than competing suppliers. Indeed, some CPR Franchise Disclosure Documents falsely stated that Mobile Defenders "currently utilizes a cost-plus formula to better ensure that the prices offered on such repair parts are competitive."

iv.     That many franchisees must rely on Playstation 5 sales to remain profitable.

**CPR's National Advertising Fund provides limited value and CPR refuses to disclose its financials.**

77.     CPR requires franchisees to pay into a "National Advertising Fund" ("NAF") of several hundred dollars a month. NAF then uses franchisee' money to pay Front Porch Solutions, LLC and Marathon Management Services, LLC to purportedly provide SEO services, marketing materials, and website services.

---

[11] *See* 16 C.F.R. § 436.5(l)(6)(iii). An affiliate is "an entity controlled by, controlling, or under common control with, another entity." 16 C.F.R. § 436.1(b). This may include parent entities.

[12] *See* 16 C.F.R. § 436.5(p).

78.     Upon information and belief, the NAF pays Front Porch and Marathon approximately a total of $1.5 million a year.

79.     Front Porch and Marathon Management are both owned by the former franchisor.

80.     Front Porch and Marathon provide minimal services. For example, Front Porch appears only to maintain a website and generate social media posts one time per month.

81.     The Franchise Agreements require CPR to disclose the NAF's annual financial statements upon a franchisee's written request.[13]

82.     Franchisees have repeatedly requested the NAF's annual financial statements but CPR has refused.

## CLAIMS

### Count 1: Breaches of Contract (CPR)

83.     Plaintiffs and the Class members each entered a franchise agreement with CPR.

84.     Plaintiffs and the Class members performed their obligations under their franchise agreements with CPR.

85.     CPR breached the franchise agreements.

86.     Section 7.1 of the Franchise Agreements provide that CPR will use "reasonable discretion" in imposing requirements on franchisees, "including purchasing new Equipment and signage . . . changing any Products and/or Services offered, methods of operation and otherwise as we may require to reflect our then-current System requirements."[14]

87.     CPR did not exercise its "reasonable discretion" in requiring franchisees to purchase and sell Apple OEM-only batteries. CPR has admitted it imposed the OEM mandate because of

---

[13] *See, e.g.,* 2016/2017 Franchise Agreement § 9.1(D); 2017/2018 Franchise Agreement § 9.1(D); 2019/2020 Franchise Agreement § 9.1(D); 2021/2022 Franchise Agreement § 9.1(D).

[14] *See e.g.,* 2016/2017 Franchise Agreement § 7.1; 2017/2018 Franchise Agreement § 7.1; 2019/2020 Franchise Agreement § 7.1; 2020/201 Franchise Agreement § 7.1.

Assurant's relationship with Apple and despite knowing the OEM battery prices were materially higher than aftermarket batteries and would lead to fewer sales. The franchisor knew the OEM mandate would cause franchisees' financial harm and offer no corresponding benefit.

88.     CPR did not exercise its "reasonable discretion" in requiring franchisees to purchase exclusively from Mobile Defenders. CPR has effectively admitted it required exclusive purchases through Mobile Defenders to protect Assurant's relationship with Apple and despite knowing that Mobile Defenders charged higher prices and had lower quality than competing suppliers.

89.     CPR did not exercise its "reasonable discretion" in effectively requiring franchisees to become Apple IRP. CPR knew the Apple IRP certificate would provide minimal benefit to franchisees but required franchisees to obtain it to promote Assurant's relationship with Apple.

90.     The Franchise Disclosure Documents characterized Mobile Defenders as offering "competitive" costs. For example, the 2017/2018 and 2019/2020 Franchise Disclosure Documents stated that Mobile Defenders "currently utilizes a cost-plus formula to better ensure that the prices offered on such repair parts are competitive."  In other words, Mobile Defenders supposedly marked-up its prices a limited amount to ensure its parts' prices were competitive with other suppliers'.

91.     Mobile Defenders did not utilize a cost-plus formula and its repair parts were not competitive.

92.     Section 7.2 of the Franchise Agreements provide that CPR will "not unreasonably deny a request to approve a proposed supplier; provided, however, that if we have negotiated an exclusive vendor contract we will not approve any other proposed suppliers for such items."[15]

93.     Before CPR mandated Mobile Defenders as the exclusive suppliers, franchisees requested that CPR approve other suppliers besides Mobile Defenders.

---

[15] *See, e.g.,* 2016/2017 Franchise Agreement § 7.2; 2017/2018 Franchise Agreement § 7.2; 2019/2020 Franchise Agreement § 7.2

94. CPR has unreasonably denied the requests to approve other suppliers despite knowing that Mobile Defenders charged higher prices and had lower quality than competing suppliers.

95. The Franchise Disclosure Documents promise that CPR will "offer [franchisees] a reasonable amount of continuing advisory services by telephone during normal business hours."[16]

96. The Franchise Agreements promise that CPR:

> will promptly provide such advice and information as we consider reasonably appropriate to assist you with all methods and procedures associated with the System marketing and advertising; management and administration, the use of the Image or any changes to it and the use and application of Products and Services. You understand and agree that such advice and information may be rendered by phone, electronically, through the Manuals, training and/or by such other means as we deem appropriate in our sole discretion.[17]

97. CPR has failed to respond to franchisee requests for continuing advisory services or have excessively delayed in responding to such requests.

98. CPR's lengthy delays and silence does not constitute "reasonable amount[s] of advisory services" or "reasonably appropriate" advice.

99. The Franchise Agreements provide that "we will prepare financial statements for the NAF annually, which will be furnished to you upon written request."[18]

100. CPR has been unable or unwilling to prepare financial statements for the NAF.

101. Despite franchisees' written requests, CPR has not provided an annual financial statement for the NAF.

102. Plaintiffs and the class members have been damaged by these breaches by (a) lost revenue and profit due to decreased sales of aftermarket batteries and increased costs of goods for

---

[16] *See, e.g.* 2017/2018 Franchise Disclosure Document at 27; 2019/2020 Franchise Disclosure Document at 22; 2021/2022 Franchise Disclosure Document at 20.

[17] *See, e.g.,* 2016/2017 Franchise Agreement § 10.4; 2017/2018 Franchise Agreement § 10.4; 2019/2020 Franchise Agreement § 10.4; 2020/2021 Franchise Agreement § 10.4.

[18] *See, e.g.,* 2016/2017 Franchise Agreement § 9.1(D); 2017/2018 Franchise Agreement § 9.1(D); 2019/2020 Franchise Agreement § 9.1(D); 2021/2022 Franchise Agreement § 9.1(D).

OEM battery sales; (b) lost revenue and profit due to higher costs from Mobile Defenders, decreased sales due to Mobile Defenders' lack of part availability, and loss of business because Mobile Defenders' poor-quality parts caused customer dissatisfaction; (c) lost employee time in completing Apple IRP training and costs of purchasing products required to become Apple IRP certified; (d) decreased sales and increased operational costs caused by the inability to obtain franchisor assistance; and (e) inability to access NAF financial statements and account for the use of those funds.

### Count 2: Breach of the Covenant of Good Faith and Fair Dealing (CPR)

103.    The implied covenant of good faith and fair dealing in the Franchise Agreements requires the parties to act in good faith, "with faithfulness to an agreed common purpose and consistency with the justified expectations of the other party."[19] Bad faith includes "the abuse of a power to specify terms or interference with or failure to cooperate in the other party's performance."[20]

104.    CPR breached the covenant of good faith and fair dealing and failed to exercise "reasonable discretion" by requiring franchisees to purchase and sell Apple OEM-only batteries, purchase exclusively from Mobile Defenders, and to become Apple IRP certified.

105.    Plaintiffs and the class members have been damaged by these breaches as set forth above.

### Count 3: Fraudulent Misrepresentation / Omission (CPR & Assurant)

106.    During June and July 2021, including on June 4, June 11, and June 18, CPR and Assurant employees, including Managing Director-Franchise Operations Chris Jourdan and Assurant Vice President of Retail Blair Frock, promised CPR franchisees that they would receive repair business from T-Mobile, an Assurant insurance client. CPR representatives made these promises verbally in

---

[19] Restatement (Second) of Contracts § 205 (1981).

[20] *Id.*

network update calls, in conversations with franchisees, and in increased revenue projections emailed to franchisees.

107.    The representations about T-Mobile repair business were material.

108.    The representations about T-Mobile repair business were made with such utter disregard and recklessness as to the truth that knowledge of falsity may be inferred. In September 2021, CPR representatives admitted that they had limited knowledge about the Assurant-T-Mobile negotiations and that it was unlikely that T-Mobile was going to select CPR stores to provide repairs.

109.    Further, as early as June 2021, Assurant was hiring cell phone repair technicians to staff repair kiosks for an unnamed "client," which is very similar to the final arrangement between T-Mobile and Assurant. This suggest that at the very time CPR and Assurant representatives were promising franchisees T-Mobile repair business, they knew Assurant would be providing those repair services—not CPR franchisees.

110.    Additionally, Defendants had a duty to disclose material information arising from Defendants' and the franchisees' special relationship and Defendants' partial revelation of the facts in their statements in June and July. Defendants knew, at best, that future T-Mobile repair business was highly uncertain and failed to disclose that substantial uncertainty to the franchisees

111.    Defendants intended franchisees to rely on their representations. They encouraged franchisees to open new stores, obtain Apple IRP certifications, and to stock up on supplies to deal with a purported increase in business from T-Mobile customers.

112.    Plaintiffs and the class members justifiably relied on the Defendants' representations. They understandably trusted CPR and Assurant executives' promises that T-Mobile insurance repairs would be coming to CPR locations. Class members opened new stores, hired employees, and purchased supplies based on promises on T-Mobile customer business.

113.    Plaintiffs and class members were damaged by their reliance on the Defendants' representations. Franchisees have had to close down stores opened in reliance on the Defendants' promises, losing their investments of tens of thousands of dollars. Franchisees also purchased supplies they were unable to use or return.

114.    Additionally, in Franchise Disclosure Documents provided to franchisees in 2021 and 2022, CPR has not disclosed that:

    i.    Assurant, CPR's ultimate owner with access to CPR franchisee sales and employee information, is actively competing with CPR franchisees across the country.

    ii.    Franchisees must sell only Apple OEM batteries.

    iii.    That many franchisees must rely on sales of gaming consoles (primarily Playstation 5 consoles) to remain profitable and that the business model based primarily on cell phone repairs is no longer viable.

    iv.    CPR does not provide the "reasonable amount of continuing advisory services by telephone during normal business hours."

115.    In Franchise Disclosure Documents provided to franchisees in 2020, 2021, and 2022, CPR did not disclose that Mobile Defenders' repair parts were more expensive and of poor quality than competing suppliers.

116.    These omissions were of material information.

117.    CPR intended franchisees to rely on its omissions. CPR provided class members with the Franchise Disclosure Documents to encourage the purchase of a CPR franchise.

118.    Plaintiffs and the class members justifiably relied on CPR's omissions. Franchisees acquired CPR franchises based on the omissions of material information from the Franchise Disclosure Documents.

119.    Plaintiffs and the class members were damaged by CPR's omissions. But for CPR's omissions franchisees would not have spent the tens of thousands of dollars to open a CPR franchise.

### Count 4: Negligent Misrepresentation / Omission (CPR and Assurant)

120.    Defendants, in the course of their business, supplied false information for the guidance of others in their business transaction. During June and July 2021, including on June 4, June 11, and June 18, CPR and Assurant representatives, including Managing Director-Franchise Operations Chris Jourdan and Assurant Vice President of Retail Blair Frock, promised CPR franchisees that they would receive repair business from T-Mobile, an Assurant insurance client. CPR representatives made these promises verbally in network update calls, in conversations with franchisees, and in increased revenue projections emailed to franchisees.

121.    These representations about the T-Mobile repair business were material.

122.    Defendants failed to exercise reasonable care or competence in obtaining or communicating the information. In September 2021, CPR representatives admitted that they had limited knowledge about the Assurant-T-Mobile negotiations and that it was unlikely that T-Mobile was going to select CPR stores to provide repairs.

123.    Further, even in June 2021, Assurant was hiring cell phone repair technicians to staff repair kiosks for an unnamed "client," which is very similar to the final arrangement between T-Mobile and Assurant. This suggest that at the very time CPR and Assurant representatives were promising franchisees T-Mobile repair business, they knew Assurant would be providing those repair services—not CPR franchisees.

124.    Additionally, Defendants had a duty to disclose material information arising from Defendants' and the franchisees' special relationship and Defendants' partial revelation of the facts in their statements in June and July. Defendants knew, at best, that future T-Mobile repair business was highly uncertain and failed to disclose that substantial uncertainty to the franchisees

125.     Defendants intended franchisees to rely on their representations. They encouraged franchisees to open new stores, obtain Apple IRP certifications, and to stock up on supplies to deal with a purported increase in business from T-Mobile customers.

126.     Plaintiffs and the class members justifiably relied on the Defendants' representations. They understandably trusted CPR and Assurant executives' promises that T-Mobile insurance repairs would be coming to CPR locations. Class members opened new stores, hired employees, and purchased supplies based on promises on T-Mobile customer business.

127.     Plaintiffs and class members were damaged by their reliance on the Defendants' representations. Franchisees have had to close down stores opened in reliance on the Defendants' promises, losing their investments of tens of thousands of dollars. Franchisees also purchased supplies they were unable to use or return.

128.     Additionally, in Franchise Disclosure Documents provided to franchisees in 2021 and 2022, CPR has not disclosed that:

i.      Assurant, CPR's ultimate owner with access to CPR franchisee sales and employee information, is actively competing with CPR franchisees across the country.

ii.     Franchisees must sell only Apple OEM batteries.

iii.    That many franchisees must rely on sales of gaming consoles (primarily Playstation 5 consoles) to remain profitable and that the business model based primarily on cell phone repairs is no longer viable.

iv.     CPR does not provide franchisees the promised "reasonable amount of continuing advisory services by telephone during normal business hours."

129.     In Franchise Disclosure Documents provided to franchisees in 2020, 2021, and 2022, CPR did not disclose that Mobile Defenders' repair parts were more expensive and of poor quality than competing suppliers.

130. These omissions were of material information.

131. CPR intended franchisees to rely on its omissions. CPR provided class members with the Franchise Disclosure Documents to encourage the purchase of a CPR franchise.

132. Plaintiffs and the class members justifiably relied on CPR's omissions. Franchisees acquired CPR franchises based on the omissions of material information from the Franchise Disclosure Documents.

133. Plaintiffs and the class members were damaged by CPR's omissions. But for CPR's omissions franchisees would not have spent the tens of thousands of dollars to open a CPR franchise.

***Count 5: Violation of Ohio Rev. Code § 4165.01 et seq. (Deceptive Trade Practices) (CPR)***

134. CPR violated Ohio Rev. Code § 4165.01 et seq. (Deceptive Trade Practices) when CPR:

- "Represent[ed] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have"[21]; and

- "Represent[ed] that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."[22]

135. CPR misrepresented the quality of the franchises it offered for sale.

136. CPR misrepresented the quality of Mobile Defenders' goods in Franchise Disclosure Documents by stating that Mobile Defenders "utilizes a cost-plus formula to better ensure that the prices offered on such repair parts are competitive."

137. CPR also misrepresented the services the franchisor would provide to franchisees in Franchise Agreements and Franchise Disclosure Documents.

---

[21] Ohio Rev. Code § 4165.02(7).

[22] *Id.*(9).

138.    These statements actually deceived or had the tendency to deceive a substantial segment of the target audience.

139.    The deception was material in that it was likely to influence a purchasing decision.

140.    Plaintiff class members have been or were likely injured as a result.

**Count 6:  Violation of Ohio Rev. Code § 1334.01 et seq. (Business Opportunity Plans) (CPR)**

141.    CPR is a "Seller" as defined under Ohio Rev. Code s 1334.01(A) because it sells or leases a "business opportunity plan"

142.    CPR franchises are "business opportunity plans" because they offer purchasers "an agreement in which a purchaser obtains the right to offer, sell, or distribute goods or services under all of the following conditions: (1) The goods or services are supplied by the seller, a third person with whom the purchaser is required or advised to do business by the seller, or an affiliated person; (2) The purchaser is required to make an initial payment greater than five hundred dollars, but less than one hundred thousand dollars, to the seller or an affiliated person to begin or maintain the business opportunity plan; and (3) The seller makes any of the following representations: (a) That the purchaser will be provided with retail outlets or accounts, or assistance in establishing retail outlets or accounts, for the sale or distribution of the goods or services; (b) That the purchaser will be provided locations, or assistance in finding locations, for vending machines, electronic games, rack displays, or any other equipment or display for use in the sale or distribution of the goods or services; (c) That the purchaser can earn a profit in excess of the initial payment; (d) That there is a market for the goods or services;" or "(e) That there is a buy-back arrangement."[23]

---

[23] Ohio Rev. Code § 1334.01(D).

143. CPR has "ma[de false or misleading statement or engage[d] in" a "deceptive or unconscionable act or practice" in violation of Ohio Rev. Code 1334.03(B), as set forth above in paragraphs 115 and 116.

**Count 7: Tortious Interference with Existing Contractual and Business Relationships (Assurant)**

144. The Plaintiffs and class members have business relationships and contracts with CPR.

145. Assurant was aware of the Plaintiffs' and class members' business relationship and contracts with CPR.

146. Assurant intentionally took an improper action to procure CPR's contractual breaches of the Franchise Agreements, as set forth above.

147. Assurant, as CPR's parent entity, required CPR to mandate OEM battery sales to further its business and contractual relationships with Apple and other cell phone manufacturers despite knowing that the OEM-only sales would impose significant financial hardships on CPR franchisees.

148. Assurant, as CPR's parent entity, required CPR to mandate exclusive part purchases from Mobile Defenders to further its business and contractual relationships with Apple and other cell phone manufacturers despite knowing that Mobile Defenders charged higher prices and provided lower quality parts than comparable suppliers.

149. Assurant, as CPR's parent entity, required CPR to effectively mandate that franchisees become Apple IRP certified to further its business and contractual relationships with Apple despite knowing that the IRP certification would have little or no benefit to franchisees.

150. Assurant was not privileged in its actions.

151. Assurant's actions caused Plaintiffs and the class members damages

***Count 8: Tortious Interference with Prospective Contractual and Business Relationships (CPR / Assurant)***

152.     The Plaintiffs and class members have prospective business relationships with T-Mobile phone users insured by Assurant and with other prospective customers who desired to purchase cell phone batteries. Likewise, the Plaintiffs and class members have or had prospective business relationships with cell phone-repair suppliers and after-market battery providers.

153.     Assurant was aware, at the time it acquired CPR, that the Plaintiffs and class members had these prospective business relationships with customers and vendors.

154.     Assurant intentionally took an improper action to prevent the Plaintiffs and class members from entering into or furthering business relationships with customers and vendors, as set forth above. Specifically, Assurant took action, with knowledge that such action would substantially harm the franchisees and their businesses, to restrict the Plaintiffs and class members from entering into agreements with certain cell phone repair and battery vendors which the Plaintiffs and class members had worked with in the past and to prevent Plaintiffs and class members from performing repairs for Assurant insureds who used T-Mobile phones.

155.     Assurant was not privileged in its actions.

156.     Assurant's actions caused Plaintiffs and the class members damages

## JURY DEMAND

157.     Plaintiffs demand a jury trial for each issue triable of right by a jury.

## PRAYER

Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

1.  Declaring this action to be a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

2.  Awarding plaintiffs and each member of the Class compensatory damages;

3. Awarding plaintiffs and each member of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys fees, expert witness fees and other costs;

4. Awarding plaintiffs and each member of the Class punitive damages against defendants;

5. Awarding such other and further relief to which it is entitled.

Respectfully submitted,

/s/ Paul J. Schumacher
**PAUL J. SCHUMACHER (0014370)**
Dickie, McCamey & Chilcote, P.C.
600 Superior Avenue East
Fifth Third Center, Suite 2330
Cleveland, Ohio 44114
216.685.1827 – Telephone
888.811.7144 – Facsimile
pschumacher@dmclaw.com
**Attorney for Plaintiffs**